1  BROWNE GEORGE ROSS LLP
   Eric M. George (State Bar No. 166403)
2    egeorge@bgrfirm.com
   Kim S. Zeldin (State Bar No. 135780)
3    kzeldin@bgrfirm.com
   Eric A. Westlund (State Bar No. 293403)
4    ewestlund@bgrfirm.com
   2121 Avenue of the Stars, Suite 2800
5  Los Angeles, California 90067
   Telephone: (310) 274-7100
6  Facsimile: (310) 275-5697

7  Attorneys for Defendant
   DANIEL "KEEMSTAR" KEEM, dba
8  DRAMAALERT

9              UNITED STATES DISTRICT COURT

10       CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

11

12 | NICKO "ROMEO" LACOSTE, dba    | Case No. 2:20-CV-02323-RGK-JPR
   | THE CALIFORNIA DREAM          |
13 | TATTOO,                       | Hon. R. Gary Klausner

14              Plaintiff,         | **DEFENDANT'S NOTICE OF
                                   | MOTION AND MOTION TO
15          vs.                    | STRIKE COMPLAINT PURSUANT
                                   | TO C.C.P. § 425.16;
16 | DANIEL "KEEMSTAR" KEEM, dba   | MEMORANDUM OF POINTS AND
   | DRAMAALERT,                   | AUTHORITIES IN SUPPORT
17                                 | THEREOF**

18              Defendant.         | Date:    June 1, 2020
                                   | Time:    9:00 a.m.
19                                 | Crtrm:   850

20                                 | Trial Date:  None Set

21

22

23

24

25

26

27

28

TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on June 1, 2020, at 9:00 a.m., or as soon thereafter as this matter may be heard before the Honorable R. Gary Klausner, United States District Judge, in the above-entitled Court, located at the 255 East Temple Street, Los Angeles, California 90012, Courtroom 850, 8th Floor, Defendant Daniel "Keemstar" Keem, Dba Dramaalert ("Defendant"), will and hereby does move the Court for an order striking Plaintiff Nicko "Romeo" Lacoste's ("Plaintiff") Complaint and awarding Defendant his attorneys' fees and costs.

This special motion to strike is made on the grounds that:

(1)     Plaintiff's Complaint, and each cause of action alleged therein, against Defendant arises from acts of Defendant in furtherance of his right of free speech under the United States Constitution and the California Constitution in connection with a public issue, as that language is defined in Code of Civil Procedure § 425.16(e)(3), and (4).

(2)     Plaintiff cannot establish that there is a probability that he will prevail on the two claims in his Complaint:  (i) "Interference with Prospective Economic Advantage" (Count I) and (ii) "Interference With Contractual Relations" (Count II).

This motion is based on this Notice of Motion, the attached Memorandum of Points and Authorities, the Request for Judicial Notice and the exhibits submitted therewith, the Declaration of Eric A. Westlund and the exhibits submitted therewith, the Declaration of John Nelson and the exhibit submitted therewith, the pleadings, papers, and records on file in this action, and upon such other evidence and argument as may be submitted at or before the hearing on the motion.

After the Court rules on Defendant's special motion to strike, Defendant intends to seek an award of his attorneys' fees and costs, pursuant to Code of Civil Procedure § 425.16(c).  *Anderson v. City of Rialto*, No. EDCV 16-1915 JGB (SPx), 2017 WL 10562687, at *3 (C.D. Cal. Aug. 8, 2017) ("In general, the party prevailing on a special motion to strike may seek an attorney fees award through three different

avenues: simultaneously with litigating the special motion to strike, by a subsequent noticed motion, or as part of a cost memorandum at the conclusion of the litigation."); *Christie v. Lester*, CV 14-08993-RGK (FFMx), 2015 WL 13439821 at * 1 (C.D. Cal. June 15, 2015) (motion for attorneys' fees filed and considered after court's grant of motion to strike).

This motion is made following the conference of counsel pursuant to L.R. 7-3 which took place on April 23, 2020.


DATED:  May 1, 2020                    BROWNE GEORGE ROSS LLP



By:    */s/ Kim S. Zeldin*
                                                Kim S. Zeldin
                                Attorneys for Defendant DANIEL
                                "KEEMSTAR" KEEM, dba DRAMAALERT

## <u>TABLE OF CONTENTS</u>

**Page**

I.   INTRODUCTION ................................................................................. 1

II.  STATEMENT OF FACTS .................................................................. 2

    A.   Keem Operates A Popular YouTube News Channel And Romeo
Is A Celebrity Tattooist And Social Media Influencer ......................... 2

    B.   In March 2019 DramaAlert Reports On Allegations Three Girls
Made Against Romeo On Twitter ......................................................... 3

        1.   Three Girls Accuse Romeo of Engaging In Sexual Conduct
With Minors On Twitter ............................................................. 3

        2.   On March 16, 2019, DramaAlert Reports On The Twitter
Accusations Against Romeo ........................................................ 4

        3.   In His March 17, 2019, DramaAlert Interview, Romeo
Admits That At Least "Some" Of The Allegations Are True ....... 4

    C.   In His February 10, 2020 DramaAlert Video, Keem Reports On A
New Claim Against Romeo Made By A 16-Year-Old Girl ................... 6

    D.   Romeo Threatens Keem With A Defamation Action ............................ 6

    E.   Romeo's Tortious Interference Complaint Admits That He
Engaged In Sexual Activities With Minors ......................................... 7

III. PLAINTIFF'S SLAPP SUIT SHOULD BE STRICKEN ................................. 8

    A.   Plaintiff's Claims Arise From Protected Activity ................................. 9

        1.   The Statements Were Made In A Public Forum ......................... 9

        2.   The YouTube Videos Were Made In Connection With An
Issue Of Public Importance ...................................................... 10

    B.   Plaintiff Cannot Establish A Probability Of Success On the Merits ..... 13

        1.   Both Of Romeo's Tortious Interference Claims Are Barred
By The First Amendment .......................................................... 13

            a.   The Statements Are Not Actionable False Statements
Of Fact ........................................................................... 14

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>TABLE OF CONTENTS</u>

### (Continued)

Page

b.     Romeo Cannot Show Actual Malice ................................. 16

2.    Plaintiff Fails To State A Claim For Tortious Interference With Prospective Economic Advantage ..................................... 17

3.    Plaintiff Fails To State A Claim For Interference With Contractual Relations .................................................................. 19

IV.    CONCLUSION ............................................................................. 20

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

<u>FEDERAL CASES</u>

*Am. Civil Liberties Union v. Reno*,
   929 F. Supp. 824 (E.D. Pa. 1996), *aff'd*, 521 U.S. 844 (1997) ............................ 10

*Art of Living Found. v. Does*,
   No. 10-CV-05022-LHK, 2011 WL 2441898 (N.D. Cal. June 15, 2011) ............. 16

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ............................................. 19

*Bartnicki v. Vopper*,
   532 U.S. 514 (2001) ............................................. 18

*Epicor Software Corp. v. Alternative Tech. Sols., Inc.*,
   No. SACV 13-00448-CJC(RNBx), 2013 WL 3930545
   (C.D. Cal. June 21, 2013) ............................................. 18

*Films of Distinction, Inc. v. Allegro Film Prods., Inc.*,
   12 F. Supp. 2d 1068 (C.D. Cal. 1998) ............................................. 14

*Gang v. Hughes*,
   111 F. Supp. 27 (S.D. Cal. 1953) ............................................. 7

*Gardner v. Martino*,
   563 F.3d 981 (9th Cir. 2009) ............................................. 14

*Gertz v. Robert Welch, Inc.*,
   418 U.S. 323 (1974) ............................................. 16

*Glob. Telemedia Int'l, Inc. v. Doe 1*,
   132 F. Supp. 2d 1261 (C.D. Cal. 2001) ............................................. 16

*Google Inc. v. Am. Blind & Wallpaper Factory, Inc.*,
   No. C 03-05340 JF, 2005 WL 832398 (N.D. Cal. Mar. 30, 2005) ...................... 19

*Grishin v. Sulkess*,
   No. CV 18-10179 DSF (AGRx), 2019 WL 4418543 (C.D. Cal. May 31, 2019) . 10

1

## <u>TABLE OF AUTHORITIES</u>

2

### (Continued)

3

**Page(s)**

4

5
*Harrell v. George*,
   No. CIV S-11-0253 MCE DAD PS, 2012 WL 3647941
6
   (E.D. Cal. Aug. 22, 2012) ..................................................................... 15

7
*Higher Balance, LLC v. Quantum Future Grp., Inc.*,
   No. CIV. 08-233-HA, 2008 WL 5281487 (D. Or. Dec. 18, 2008) ...................... 15
8

9
*Howard v. Cty. of Riverside*,
   No. EDCV 12-00700 VAP (OPx), 2013 WL 12138760
10
   (C.D. Cal. Jan. 10, 2013) ..................................................................... 15

11
*In re NCAA Student-Athlete Name & Likeness Licensing Litig.*,
12
   724 F.3d 1268 (9th Cir. 2013) ................................................................ 8

13
*Knievel v. ESPN*,
14
   393 F.3d 1068 (9th Cir. 2005) ................................................................ 14

15
*Maloney v. T3Media, Inc.*,
   94 F. Supp. 3d 1128 (C.D. Cal. 2015),
16
   *aff'd*, 853 F.3d 1004 (9th Cir. 2017) ....................................................... 10

17
*Manzarek v. St. Paul Fire & Marine Ins. Co.*,
18
   519 F.3d 1025 (9th Cir. 2008) ................................................................ 15

19
*Milkovich v. Lorain Journal Co.*,
20
   497 U.S. 1 (1990) ............................................................................... 14

21
*Nestle USA, Inc. v. Crest Foods, Inc.*,
22
   No. LA CV16-07519 JAK (AFMx), 2017 WL 3267665
   (C.D. Cal. July 28, 2017) ..................................................................... 19
23

24
*New York Times v. Sullivan*,
   376 U.S. 254 (1964) ........................................................................... 16
25

26
*Nexsales Corp. v. Salebuild, Inc.*,
   No. C-11-3915 EMC, 2012 WL 216260 (N.D. Cal. Jan. 24, 2012) .................... 20

27

28

# <u>TABLE OF AUTHORITIES</u>

## (Continued)

**Page(s)**

*Novel v. Los Angeles Cnty. Sheriff's Dep't*,
  No. 2:19-cv-01922-RGK-AGR, 2019 WL 7940676
  (C.D. Cal. July 23, 2019)......................................................................... 9, 20

*Peak Health Ctr. v. Dorfman*,
  No. 19-cv-04145-VKD, 2019 WL 5893188 (N.D. Cal. Nov. 12, 2019) .............. 19

*Piping Rock Partners, Inc. v. David Lerner Assocs., Inc.*,
  946 F. Supp. 2d 957 (N.D. Cal. 2013),
  *aff'd*, 609 F. App'x 497 (9th Cir. 2015) ..................................................... 12, 17, 18

*Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*,
  890 F.3d 828 (9th Cir.), *amended*, 897 F.3d 1224 (9th Cir. 2018), and
  *cert. denied sub nom. Ctr. for Med. Progress v. Planned Parenthood
  Fed'n of Am.*, 139 S. Ct. 1446 (2019) ..................................................... 9

*Reno v. Am. Civil Liberties Union*,
  521 U.S. 844 (1997) .............................................................................. 10

*Resolute Forest Prod., Inc. v. Greenpeace Int'l*,
  302 F. Supp. 3d 1005 (N.D. Cal. 2017)............................................. 13, 14, 16, 17

*Sybersound Records, Inc. v. UAV Corp.*,
  517 F.3d 1137 (9th Cir. 2008) ........................................................... 17, 19

*Tensor Law P.C. v. Rubin*,
  No. 2:18-CV-01490-SVW-SK, 2019 WL 3249595
  (C.D. Cal. Apr. 10, 2019) ...................................................................... 9

*Unelko Corp. v. Rooney*,
  912 F.2d 1049 (9th Cir. 1990) ............................................................... 14

*United Artists Corp. v. United Artist Studios LLC*,
  No. CV 19-828-MWF, 2019 WL 8221088 (C.D. Cal. Aug. 2, 2019) ................. 19

*Verizon Delaware, Inc. v. Covad Commc'ns Co.*,
  377 F.3d 1081 (9th Cir. 2004) ............................................................... 20

# TABLE OF AUTHORITIES

### (Continued)

**Page(s)**

## STATE CASES

*Barrett v. Rosenthal*,
   40 Cal. 4th 33 (2006) ................................................................ 10

*Chaker v. Mateo*,
   209 Cal. App. 4th 1138 (2012) ............................................... 12

*Cross v. Cooper*,
   197 Cal. App. 4th 357 (2011),
   *as modified on denial of reh'g* (Aug. 4, 2011) ....................... 11

*D.C. v. R.R.*,
   182 Cal. App. 4th 1190 (2010), *as modified* (Apr. 8, 2010) ............... 10

*Della Penna v. Toyota Motor Sales, U.S.A., Inc.*,
   11 Cal. 4th 376 (1995) ............................................................ 17

*Dowling v. Zimmerman*,
   85 Cal. App. 4th 1400 (2001) ................................................. 13

*Equilon Enterprises v. Consumer Cause, Inc.*,
   29 Cal. 4th 53 (2002) ................................................................ 8

*Filmon.com Inc. v. DoubleVerify Inc.*,
   7 Cal. 5th 133 (2019) ............................................................... 10

*Hecimovich v. Encinal Sch. Parent Teacher Org.*,
   203 Cal. App. 4th 450 (2012) ............................................ 12, 13

*Ingels v. Westwood One Broad. Servs., Inc.*,
   129 Cal. App. 4th 1050 (2005) ............................................... 12

*J'Aire Corp. v. Gregory*,
   24 Cal. 3d 799 (1979) .............................................................. 17

*Korea Supply Co. v. Lockheed Martin Corp.*,
   29 Cal. 4th 1134 (2003) .......................................................... 17

# <u>TABLE OF AUTHORITIES</u>

## (Continued)

**Page(s)**

*Krinsky v. Doe 6*,
    159 Cal. App. 4th 1154 (2008) ............................................................................ 14

*Nygard, Inc. v. Uusi-Kerttula*,
    159 Cal. App. 4th 1027 (2008) ............................................................................ 10

*Seelig v. Infinity Broad. Corp.*,
    97 Cal. App. 4th 798 (2002) ................................................................... 10, 11, 12

*Sipple v. Foundation for Nat. Progress*,
    71 Cal. App. 4th 226 (1999) ............................................................................... 13

*Stewart v. Rolling Stone LLC*,
    181 Cal. App. 4th 664 (2010),
    *as modified on denial of reh'g* (Feb. 24, 2010) ................................................. 11

*Terry v. Davis Cmty. Church*,
    131 Cal. App. 4th 1534 (2005) ........................................................................... 11

*Westside Ctr. Assocs. v. Safeway Stores 23, Inc.*,
    42 Cal. App. 4th 507 (1996) ............................................................................... 18

## <u>STATE STATUTES</u>

Cal. Civ. Code
    § 48a(a) ................................................................................................................. 7

Cal. Civ. Proc. Code
    § 425.16 ...................................................................................................... 1, 8, 12
    § 425.16(a) ............................................................................................................ 8
    § 425.16(b)(1) ....................................................................................................... 8
    § 425.16(e)(3) ................................................................................................. 9, 10
    § 425.16(e)(4) ....................................................................................................... 9

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

California enacted its anti-SLAPP statute, Code of Civil Procedure § 425.16, to deter precisely the type of lawsuit being prosecuted here:  one seeking to silence a YouTube news reporter with nonspecific business interference claims seeking $3.5 million in "general and special damages," as well as punitive damages and injunctive relief.

Defendant Daniel "Keemstar" Keem ("Keem" or "Defendant") operates DramaAlert, a popular YouTube channel that reports on breaking news about social media influencers and internet celebrities.  On February 10, 2020, DramaAlert reported on a 15 year-old girl's allegations that celebrity tattooist and social-media influencer Nicko "Romeo" Lacoste ("Romeo" or "Plaintiff") had engaged in sexually inappropriate conduct with her.  This was not a "first" for Romeo.  About one year prior, as DramaAlert reported on March 16, 2019, other girls had accused Romeo of sending them sexually explicit messages ("sexting") when they were minors, and of engaging in sexual acts with one of them when she was a minor.  At that time, Romeo appeared on DramaAlert for an interview, acknowledging that he sent the minors sexting messages; admitting the sexual content of what he had sent; and conceding that he knew "some" of the girls he sexted with were minors.

Now, by the present lawsuit, Romeo claims that Keem's reporting has interfered with Romeo's prospective economic advantage and contractual relationships.  Such unspecified averments are pure bunk.  But there is a more immediate -- and dispositively fatal -- flaw with Romeo's complaint:  because Keem's reporting is constitutionally-protected speech, and because Romeo cannot remotely establish a "probability" of prevailing on his claims, California's anti-SLAPP law compels the immediate dismissal of Romeo's suit, and the reimbursement of Keem's attorneys' fees.

## II.   STATEMENT OF FACTS

### A.   Keem Operates A Popular YouTube News Channel And Romeo Is A Celebrity Tattooist And Social Media Influencer

Keem's popular DramaAlert YouTube channel features reporting on news on the social interactions in online entertainment.  Defendant's Request for Judicial Notice ("RJN") Ex. 5 at p. 10; Dkt. 1 ¶ 7.  The DramaAlert channel has more than 5.5 million unique subscribers and has amassed more than 1.2 billion video views since the channel was established on June 15, 2014.  RJN Ex. 5 at p. 10.[1]

Thirty-one-year-old Romeo admits that he is a "public figure," Declaration of John Nelson ("Nelson Dec.") Ex. 1 at p. 3, promoting himself as a "world famous tattoo artist with an equally prestigious clientele" who owns and operates a tattoo parlor called the "California Dream Tattoo Shop" in Los Angeles, RJN Ex. 11 at p. 16 (www.romeolacoste.com).  His website boasts that his clients include Justin Bieber, Ariana Grande, and Kendrick Lamar.  RJN Ex. 11 at p. 16.  In addition to his high-profile tattoo shop and website, Romeo has a prominent online presence, including a YouTube channel with nearly 1 million subscribers and an Instagram account with 1.8 million followers.  RJN Ex. 12 at p. 18; Ex. 13 at p. 19.  His related Instagram account @thecaliforniadream has approximately 479 thousand followers.  RJN Ex. 14 at p. 20.  His rise to prominence has been covered in mainstream publications including *Forbes* and *The Daily Mail*.  RJN Exs. 15, 16.  Romeo has also appeared on the reality television program *Best Ink*.  RJN Ex. 17 at p. 32.

---

[1]  Keem promotes his YouTube content on related social media accounts on Twitter, Facebook, and Instagram, where the @DramaAlert handle has 44,000, 29,000, and 708,000 followers, respectively.  RJN Ex. 6 at p. 11; Ex. 7 at p. 12; Ex. 10 at p. 13. In addition to his @DramaAlert accounts, Keem also posts and promotes content on Twitter and Instagram under the handle @Keemstar, where he has 2.8 million and 210,000 followers, respectively.  RJN Ex. 9 at p. 14; Ex. 10 at p. 15.

B.     **In March 2019 DramaAlert Reports On Allegations Three Girls Made Against Romeo On Twitter**

    1.     **Three Girls Accuse Romeo of Engaging In Sexual Conduct With Minors On Twitter**

On March 15, 2019, a girl using the handle @yellowchairr ("Yellowchairr") made several Twitter posts publicly accusing Romeo of sending her sexually explicit direct messages ("DMs") propositioning her to have sex with him in 2016, when she was 15 and he was 27. Yellowchairr published six "tweets," incorporating screen shot images of Romeo's 2016 DMs. RJN Ex. 18. In an October 5, 2016, DM Romeo asked Yellowchairr, "You're not down to do it sooner? Or ***you wanna wait till you're 18?***" RJN Ex. 18 at p. 16 (emphasis added). In this same DM, Romeo invited the minor girl to come to his house to do various sexual acts, including: "Love my balls massaged and sucked on," "Love my asshole licked," "my fav is deepthroat," "You can even chase my cum down with another shot," and "By the time you leave you'll have a tummy full of cum and alcohol." RJN Ex. 18 at pp. 56-57.

Yellowchairr's tweet resulted in numerous responsive tweets from members of the public reacting to her publication of the DMs, one of which came from another girl (@ultrahoney1 or "Ultrahoney1") who sent a tweet on March 16, 2019, reporting that she had had a two-year sexual relationship with Romeo when she "was 14-17 and he was 19-22." RJN Ex. 19 at p. 71. Ultrahoney1 alleged that Romeo sexually assaulted her on their first date when he "put his hands down [her] pants and covered [her] mouth when [she] screamed." *Id.* She also expressed her belief that Romeo "took advantage" of the fact that she was a minor and coerced her to perform certain sexual acts. *Id.*

On March 16, 2019, at 1:22 a.m., a girl using the handle @Lilou_Vos ("Lilou") sent a tweet to Keem stating: "ask romeo about how he is into 'DDLG' relationships . . . daddy dom little girl. He's been like this since he lived in San

1    Diego.  We've all got stories.  He's been trying to pick up underage girls since

2    myspace days.  I was one of them."  RJN Ex. 20 at p. 78.

3         Romeo did not dispute the allegations by Yellowchairr, Ultrahoney, or Lilou

4    on Twitter and instead shut down his Twitter account.  RJN Exs. 25, 26; Westlund

5    Dec. Ex. 2 at p. 5; Ex. 3 at pp. 8-22.

6              **2.      On March 16, 2019, DramaAlert Reports On The Twitter**

7                      **Accusations Against Romeo**

8         On March 16, 2019, Keem reported, in a DramaAlert video, on the Twitter

9    accusations made by Yellowchairr, Ultrahoney1, and Lilou, (i) publishing the DMs

10   with Romeo that Yellowchairr had included in her tweets the previous day, as well as

11   the Twitter message from Lilou to Keem that had been received that morning, and

12   (ii) including an audio interview of Ultrahoney1 in which she confirmed that she was

13   14 or 15 years old when she started dating then-19 year old Romeo.  RJN Ex. 25;

14   Westlund Dec. Ex. 2.  She informed Keem and the audience that in one sexual

15   encounter with Romeo, he had "peed" on her without her consent.  RJN Ex. 25;

16   Westlund Dec. Ex. 2 at p. 6.

17             **3.      In His March 17, 2019, DramaAlert Interview, Romeo Admits**

18                     **That At Least "Some" Of The Allegations Are True**

19        Romeo voluntarily appeared on DramaAlert by telephone on March 17, 2019.

20   RJN Ex. 26; Westlund Dec. Ex. 3.  In his 36-minute interview, Romeo did not deny

21   sexting with underage girls, and he admitted knowing that at least "some" of the girls

22   were underage.  RJN Ex. 26; Westlund Dec. Ex. 3 at pp. 8-22.  Romeo further

23   admitted sending the DMs published by the girls on Twitter and did not dispute the

24   content of the DMs.  *Id.*  Rather, Romeo attempted to "defend" himself by arguing

25   that *some* (but not all) of the DMs were taken out of context and that unspecified text

26   was allegedly missing that would show that the minor girls had initiated the

27   flirtatious contact with him:  "some [of the texts] are real and some are fabricated."

28   RJN Ex. 26; Westlund Dec. Ex. 3 at p. 8.  Yet he never responds to the questions

about how (or which of) the texts were allegedly "fabricated," merely obliquely stating that there were ways to "manipulate" "today's social media."  RJN Ex. 26; Westlund Dec. Ex. 3 at pp. 8-9.  When asked if material was added to the messages, Romeo replied, "No I'm not saying that there were things added."  RJN Ex. 26; Westlund Dec. Ex. 3 at p. 10.

When asked if he knew at the time that the girls he was sexting with were under 18 years old, Romeo admitted he knew that *some* of them were:  "I did not willingly know that *some* of these [girls] were underage."  RJN Ex. 26; Westlund Dec. Ex. 3 at p. 18 (emphasis added).  *See also* RJN Ex. 26; Westlund Dec. Ex. 3 at p. 20 (Romeo states:  "I've admitted that some of it was real").  During the interview, Keem pointed to Romeo's DM to Yellowchairr wherein he asked her if she was "willing to do it before you turn 18," and Romeo tried to defend himself by saying that Yellowchairr told him she was "almost 18 years old."  RJN Ex. 26; Westlund Dec. Ex. 3 at pp. 9-10.  Romeo then admitted that being "almost" 18 does not "make the situation much better," acknowledging he was "not perfect."  RJN Ex. 26; Westlund Dec. Ex. 3 at pp. 10, 15.

In the interview, Romeo also admitted that he had a sexual relationship with Ultrahoney1 when she was a minor but tried to excuse his behavior by arguing that Ultrahoney1 had had sexual relationships with other older men.  He argued, for example, "She told me that she had done many sexual things with those people . . . older than me."  RJN Ex. 26; Westlund Dec. Ex. 3 at p. 12.  When confronted with Ultrahoney1's allegation that Romeo "peed" on her without her consent when she was a minor, Romeo did not deny it, saying only that he did not remember whether it had happened or not and indicating it was possible by saying:  "I am a human being . . . I'm not ashamed for [sic] some of the sexual things I am into."  RJN Ex. 26; Westlund Dec. Ex. 3 at pp. 11, 12.

Romeo attempted to excuse his actions by citing his alleged inexperience with "fame" in 2016 and deflecting the blame onto the underage girls:  "This happened in 2016.  This was like 3 years ago.  I was in a completely different time in my life."  RJN Ex. 26; Westlund Dec. Ex. 3 at pp. 9-10.  He goes on to explain that when he was new to "fame," girls were throwing themselves at him because of his celebrity status.  *Id.*  Later, in an attempt to apologize to the girls, Romeo states that he is not "perfect" and that he "sure as hell wasn't perfect in 2000-fucking-16, when this whole shit was new to me."  RJN Ex. 26; Westlund Dec. Ex. 3 at p. 15.

## C.    In His February 10, 2020 DramaAlert Video, Keem Reports On A New Claim Against Romeo Made By A 16-Year-Old Girl

On February 10, 2020, Keem interviewed a 16-year-old girl named Meerah who had reached out to Keem on Twitter about inappropriate sexual texts and a FaceTime video she had with Romeo.  RJN Ex. 27; Westlund Dec. Ex. 4.  Keem displayed screen shots of DMs between Meerah (when she was 15) and Romeo (when he was 30), which reflected that Romeo knew she was under 18.  RJN Ex. 27; Westlund Dec. Ex. 4 at p. 24 (Romeo told Meerah, "I trust you, but we have to be good for now and then when you're 18 we don't have to hold back.").  Romeo then asked her to communicate with him on SnapChat (presumably because SnapChat communications are automatically deleted).  *Id.*  Keem also played the FaceTime video that Meerah had recorded of a conversation she had with Romeo in which Romeo displays a frontal view of his penis to her.  RJN Ex. 27; Westlund Dec. Ex. 4 at p. 25.

## D.    Romeo Threatens Keem With A Defamation Action

On February 13, 2020, Romeo by and through his counsel, Raoul J. Severo ("Severo"), sent Keem a cease and desist letter claiming that all of Keem's videos "share a slanted and carefully curated version of the events that do not fully express the truth . . . ."  Nelson Dec. Ex. 1 at p. 3.  Severo asserts, "Mr. Lacoste is a ***public***

1 *figure* and continued publication of these videos and posts will be considered

2 *malicious* in nature . . . ." *Id.* (emphasis added).[2]

3 **E.** **Romeo's Tortious Interference Complaint Admits That He Engaged**

4 **In Sexual Activities With Minors**

5 On March 10, 2020, Romeo filed his Complaint, which includes only two

6 claims:  tortious interference with prospective economic advantage and tortious

7 interference with contractual relations.  *See* Dkt. 1.  Noticeably absent are any claims

8 of defamation, as originally threatened.  Yet, the gravamen of the Complaint is still

9 defamation, i.e., that Keem made public statements on DramaAlert that injured

10 Romeo's reputation and "destroy[ed]" his business.  *Id.* ¶¶ 11-20.  Oddly, the

11 Complaint does not allege any of the statements were false, and appears to claim that

12 the publication of true information is actionable conduct.  The statements Plaintiff

13 complains about fall into two categories:  (1) alleged accusations that Romeo was a

14 pedophile (*id.* ¶ 11); and (2) statements that Romeo's career is "finished" as a result

15 of the girls' allegations (*id.* ¶ 20).

16 *Alleged Pedophilia Allegations*.  Although the Complaint alleges that Keem

17 "accused" Romeo of "pedophilia" in three videos published on YouTube on March

18 16, 2019, March 17, 2019, and February 10, 2020, it only addresses the content of

19 the February 10, 2020, video.  The Complaint does not offer any quotes or statements

20 from Keem stating that Romeo is a pedophile,[3] and in fact, concedes that Romeo

21 engaged in a "conversations of a sexual nature" with girl who he admits was "a

22

23 ―――――――――――――

[2]  The Motion to Strike should also be granted with respect to the statements made in
the March 2019 DramaAlert videos because Romeo is only entitled to recover
special damages for those claims, which he has not adequately alleged.  *See* Cal. Civ.
Code § 48a(a) (a plaintiff is limited to "special damages" unless a correction is
demanded by written notice served "within 20 days after knowledge of the
publication or broadcast"); *see Gang v. Hughes*, 111 F. Supp. 27, 29 (S.D. Cal. 1953)
(general allegation of "loss of business" is not sufficient to plead special damages).

[3]  As discussed in section III.B.1.A below, Keem does not in fact accuse Romeo of
pedophilia.  Rather, he uses the word "pedo" as shorthand in expressing his opinion
about the nature of the girls' allegations.

minor." *Id.* ¶¶ 12-14.  His only "defense" is that the girl (Meerah) "falsely told" him that "she was of majority status" (*id.* ¶ 15), but this is factually contradicted by Romeo's DM to then-15-year-old Meerah (the contents of which Romeo does not dispute), which states, "I trust you, but we have to be good for now ***and then when you're 18*** we don't have to hold back."  RJN Ex. 27; Westlund Dec. Ex. 4 at p. 24 (emphasis added).[4]

   ***Opinions About The Impact Of The Girls' Allegations On Romeo's Career***. The second category of statements Plaintiff complains about in the Complaint are Keem's opinions about the impact of the girls' allegations on Romeo's career, i.e., "'[Plaintiff] is finished,' '[Plaintiff's] career is finished,' and '[Plaintiff belongs in a cage.'"

## III.   PLAINTIFF'S SLAPP SUIT SHOULD BE STRICKEN

   Code of Civil Procedure § 425.16 provides a means of quickly disposing of actions intended to "chill the valid exercise of the constitutional rights" by authorizing a "special motion to strike" any SLAPP suits or causes of action arising from the exercise of one's "right of petition or free speech under the United States Constitution . . . ."  Cal. Civ. Proc. Code § 425.16(b)(1).  California's anti-SLAPP statute is available to litigants in federal court.  *In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, 724 F.3d 1268, 1272 (9th Cir. 2013).  The statute is to "be construed broadly" to protect First Amendment rights.  Cal. Civ. Proc. Code § 425.16(a); *see also Equilon Enterprises v. Consumer Cause, Inc.*, 29 Cal. 4th 53, 60 (2002) (citing statute).

   Adjudicating an anti-SLAPP motion is a two-step process.  First, the Court

---

[4]  In any event, it is irrelevant whether Romeo knew Meerah was a minor or not at the time he DMed her.  Romeo admits in the Complaint that he had a sexual conversation with a minor on a video recording.  He admits that the February 10, 2020, video was "made by the individual with which [sic] Plaintiff was engaging in the sexually charged conversation" and that "[t]his individual was a minor, hereinafter known as 'Person A.'"  Dkt. 1 ¶¶ 13-14.  Neither the Complaint nor the video disputes that Romeo showed his penis to that minor girl.

decides whether the "defendant has made a threshold showing that the challenged cause of action is one arising from protected activity." *Tensor Law P.C. v. Rubin*, No. 2:18-cv-01490-SVW-SK, 2019 WL 3249595, at *4 (C.D. Cal. Apr. 10, 2019). The burden then shifts to the plaintiff to demonstrate a "probability of prevailing on the merits." *Id.*; *Novel v. Los Angeles Cnty. Sheriff's Dep't*, No. 2:19-cv-01922-RGK-AGR, 2019 WL 7940676, at *7 (C.D. Cal. July 23, 2019).  "[W]hen an anti-SLAPP motion to strike challenges only the legal sufficiency of a claim, a district court should apply the Federal Rule of Civil Procedure 12(b)(6) standard and consider whether a claim is properly stated." *Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 890 F.3d 828, 834 (9th Cir.), *amended*, 897 F.3d 1224 (9th Cir. 2018), and *cert. denied sub nom. Ctr. for Med. Progress v. Planned Parenthood Fed'n of Am.*, 139 S. Ct. 1446 (2019).

Here, the Motion to Strike challenges the legal sufficiency of the claims.  As the subject matter of the YouTube videos at issue is undeniably a matter of public interest, and because Plaintiff cannot establish a probability of prevailing on his claims, the Complaint must be stricken and the action dismissed with prejudice.[5]

## A. **Plaintiff's Claims Arise From Protected Activity**

The anti-SLAPP statute protects statements made "in . . . a public forum in connection with an issue of public interest."  Cal. Civ. Proc. Code § 425.16(e)(3) and (4).  As set forth below, the statements were made (1) in a public forum and (2) in connection with a matter of public interest.

### 1. **The Statements Were Made In A Public Forum**

Plaintiff's Complaint is based entirely on statements posted on the internet website YouTube.  Dkt. ¶ 11.  The YouTube videos did not provide selective access

---

[5]  As set forth below, given the deficiencies in Plaintiff's legal theories under the two claims for relief, "amendment would be futile under the federal standards, because no additional factual allegations could overcome the conclusion as a matter of law" that Defendant could not have tortiously interfered with prospective economic advantage or contract.  *See Tensor Law*, 2019 WL 3249595, at *13.

and are freely available to the public.  RJN Exs. 25-27.  As the internet is "the most participatory form of mass speech yet developed," *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 863 (1997) (citing *Am. Civil Liberties Union v. Reno*, 929 F. Supp. 824, 883 (E.D. Pa. 1996), *aff'd*, 521 U.S. 844 (1997)), both state and federal courts have consistently recognized that internet websites accessible to the public qualify as public forums for purposes of the anti-SLAPP statute.  *See, e.g.*, *Grishin v. Sulkess*, No. CV 18-10179 DSF (AGRx), 2019 WL 4418543, at *4 (C.D. Cal. May 31, 2019) (Facebook posts are public forums for purposes of the anti-SLAPP statute); *Maloney v. T3Media, Inc.*, 94 F. Supp. 3d 1128, 1134 (C.D. Cal. 2015), *aff'd*, 853 F.3d 1004 (9th Cir. 2017) (defendant's posts on a website were made in a public forum because they were "part of the internet at-large"); *Barrett v. Rosenthal*, 40 Cal. 4th 33, 41 n.4 (2006) ("Web sites accessible to the public . . . are 'public forums' for purposes of the anti-SLAPP statute.  [Citations.]").

## 2.  The YouTube Videos Were Made In Connection With An Issue Of Public Importance

Section 425(e)(3)'s requirement that the challenged activity be "'in connection with an issue of public interest' . . . is to be 'construed broadly' so as to encourage participation by all segments of our society in vigorous public debate related to issues of public interest."  *Seelig v. Infinity Broad. Corp.*, 97 Cal. App. 4th 798, 808 (2002).  An issue of public interest need not be "significant" to be protected by the anti-SLAPP statute -- it can be "*any issue in which the public is interested.*"  *Nygard, Inc. v. Uusi-Kerttula*, 159 Cal. App. 4th 1027, 1042 (2008) (emphasis in original).  In evaluating whether a statement concerns a public issue, courts look to whether the subject of the activity underlying the claim:  "(1) was a person or entity in the public eye; (2) could affect large numbers of people beyond the direct participants; or (3) involved a topic of widespread, public interest."  *D.C. v. R.R.*, 182 Cal. App. 4th 1190, 1226 (2010), *as modified* (Apr. 8, 2010); *See also*, *Filmon.com Inc. v. DoubleVerify Inc.*, 7 Cal. 5th 133, 145 (2019) (court should consider the content and

1    the context of the statement (e.g., the identity of the speaker, the audience, and the

2    purpose of the speech) in determining whether statement was made in furtherance of

3    free speech in connection with a public issue).

4          Prior the airing of the DramaAlert YouTube videos, Romeo was in the public

5    eye, and, as his lawyer admits, he is a "public figure."  Nelson Dec. Ex. 1 at p. 3.

6    Indeed, Romeo was and is, in the words of his own website, a "world famous"

7    celebrity tattoo artist.  RJN Ex. 11 at p. 16.  His prominence both in the online social

8    media community and otherwise is evident from his significant social media

9    following including nearly two million Instagram followers, his interviews and press

10   attention, and his appearance on the reality television program *Best Ink*.  *See supra*

11   section II.A.  By his "accomplishments, mode of living, professional standing or

12   calling," Romeo "create[d] a legitimate and widespread attention to [his] activities."

13   *Stewart v. Rolling Stone LLC*, 181 Cal. App. 4th 664, 677-78 (2010), *as modified on*

14   *denial of reh'g* (Feb. 24, 2010) (statements about "indie" musicians were matter of

15   public interest).  *See also Seelig*, 97 Cal. App. 4th at 808 (by choosing to participate

16   in a reality TV show, "plaintiff voluntarily subjected herself to inevitable scrutiny

17   and potential ridicule by the public and the media").  Therefore, the YouTube videos

18   about him qualify as matter of public interest.

19          Moreover, the subject matter of the videos -- an adult celebrity's sexual

20   relationship with a minor and his preying on underage girls via sexting and sending

21   sexually explicit videos of his penis -- certainly qualifies as a matter of public

22   interest.  For example, the court in *Terry v. Davis Cmty. Church*, 131 Cal. App. 4th

23   1534, 1547 (2005), held that "the issue as to whether or not an adult who interacts

24   with minors in a church youth program has engaged in an inappropriate relationship

25   with any of the minors is clearly a matter of public interest."  *See also Cross v.*

26   *Cooper*, 197 Cal. App. 4th 357, 375 (2011), *as modified on denial of reh'g* (Aug. 4,

27   2011) (it is "obvious" that "preventing child sexual abuse and protecting children

28

DEFENDANT'S NOTICE OF MOTION AND MOTION TO STRIKE COMPLAINT PURSUANT TO CCP 425.16

1  from sexual predators are issues of widespread public interest").[6]

2       Keem's videos are also protected because they served as a warning to other

3  young girls.  *See, e.g.*, RJN Ex. 27; Westlund Dec. Ex. 4 at p. 26 (Keem states:  "I

4  just want to get everything we possibly can out there, because, you know, even

5  though we broke this story . . . still he is finding victims.").  Courts have held that

6  such statements, which are in the "nature of consumer protection information," such

7  as a "warning" not to use the opposing party's services, are matters of public interest.

8  *Chaker v. Mateo*, 209 Cal. App. 4th 1138, 1144-45 (2012) (internal quotations

9  omitted); *Piping Rock Partners, Inc. v. David Lerner Assocs., Inc.*, 946 F. Supp. 2d

10 957, 969 (N.D. Cal. 2013), *aff'd*, 609 F. App'x 497 (9th Cir. 2015) (statement

11 concerned a matter of public interest because it was "a warning to consumers not to

12 do business with plaintiffs because of their allegedly faulty business practices").

13      Statements of lesser public significance than those at issue here have been held

14 to be protected as an issue of public interest under section 425.16.  *See, e.g.*,

15 *Hecimovich v. Encinal Sch. Parent Teacher Org.*, 203 Cal. App. 4th 450, 464-66

16 (2012) (safety in youth sports and problem coaches and problem parents in youth

17 sports are issues of public interest under the anti-SLAPP law); *Seelig*, 97 Cal. App.

18 4th at 807-08 (radio shock jock commentary about plaintiff's decision to appear on

19 reality television show was made in connection with an issue of public interest and is

20 protected under (e)(3)); *Ingels v. Westwood One Broad. Servs., Inc.*, 129 Cal. App.

21

22 [6] It is of no moment that the statements concern conduct between private
   individuals.  *See Chaker v. Mateo*, 209 Cal. App. 4th 1138, 1145 (2012) ("[C]ases

23 which have considered the public interest requirement of the Anti-SLAPP Law have
   emphasized that the public interest may extend to statements about conduct between

24 private individuals.").  In *Chaker*, Mateo and her then-mother posted statements
   about Mateo's ex-romantic partner and his business on consumer review websites

25 and a social networking site called "Topix," calling him a "criminal" and a "deadbeat
   *dad*" and accusing him of "taking steroids" and "picking up street walkers and

26 homeless drug addicts."  *Id*. at 1142 (emphasis in original).  The trial court granted
   plaintiff's anti-SLAPP motion and the Court of Appeal affirmed, finding "little

27 difficulty" in concluding the statements on both the consumer review sites and the
   Topix website "were of public interest."  *Id*. at 1146.

28

4th 1050, 1062-64 (2005) (interchange on radio call-in talk show regarding whether caller was too old to participate in the show involves a matter of public interest and is protected under (e)(3) and (e)(4)); *Dowling v. Zimmerman*, 85 Cal. App. 4th 1400, 1420 (2001) (statement that someone had entered the tenants' locked garage and turned the dial of their water heater off is protected under (e)(4) as conduct that "arguably involved public issues of nuisance and safety," even though it directly affected only two tenants); *Sipple v. Foundation for Nat. Progress*, 71 Cal. App. 4th 226, 238-40 (1999) (article discussing alleged physical altercation in the context of a custody battle between two individuals was protected under (e)(3)) because "domestic violence is an extremely important public issue in our society").

The public here was indeed interested in the subject matter of the YouTube videos, as evidenced by the number of times the YouTube videos were viewed, the publicity the videos received, and the publicity the lawsuit has received. *See Hecimovich*, 203 Cal. App. 4th at 468 ("[W]e do note that the scope and breadth of the comments, not to mention the article itself [referring to an article discussing the underlying lawsuit in *The Almanac Online*] show just how much the public was interested in the issue."). As of April 28, 2020, each of the three videos in question was viewed by more than 1.5 million people. RJN Exs. 25-27 (March 16, 2019, video viewed 2,295,447 times; March 17, 2019, viewed 2,337,611 times; and February 10, 2020, video viewed 1,729,775 times). Both Keem's interview of Romeo and Romeo's lawsuit against Keem have received mainstream press coverage. See RJN Exs. 21, 22.

### B.   Plaintiff Cannot Establish A Probability Of Success On the Merits

#### 1.   Both Of Romeo's Tortious Interference Claims Are Barred By The First Amendment

"[C]laims which are similar to defamation, such as tortious interference with contractual or prospective relationships 'are subject to the same first amendment requirements that govern actions for defamation.'" *Resolute Forest Prod., Inc. v.*

*Greenpeace Int'l*, 302 F. Supp. 3d 1005, 1016 (N.D. Cal. 2017) (quoting *Unelko Corp. v. Rooney*, 912 F.2d 1049, 1058 (9th Cir. 1990)).  "Under California law, First Amendment limitations are applicable to all claims, of whatever label, whose gravamen is the alleged injurious falsehood of a statement."  *Films of Distinction, Inc. v. Allegro Film Prods., Inc.*, 12 F. Supp. 2d 1068, 1082 (C.D. Cal. 1998) (internal quotation omitted).  *See also Krinsky v. Doe 6*, 159 Cal. App. 4th 1154, 1178 (2008) (the protections of speech from the First Amendment "must be broadly applicable whenever the gravamen of the claim is injurious falsehood").  Here, the gravamen of Plaintiff's claims is the alleged injurious statements.  The First Amendment protects Keem's statements because (a) they are not actionable false statements of fact and (b) Plaintiff cannot show Keem acted with actual malice.

### a.  The Statements Are Not Actionable False Statements Of Fact

Keem's statements are "shielded by the First Amendment as statements that are not 'provable as false,' or statements that 'cannot reasonably be interpreted as stating actual facts.'"  *Resolute Forest Products*, 302 F. Supp. 3d at 1020 (quoting *Milkovich v. Lorain Journal Co*., 497 U.S. 1, 19-20 (1990)).  To determine whether a statement is a fact or an opinion for purposes of First Amendment protection, courts engage in a context-driven inquiry considering the totality of the circumstances in which the statement was made.  *Knievel v. ESPN*, 393 F.3d 1068, 1074-75 (9th Cir. 2005).  Courts consider whether the statement used the "sort of loose, figurative, or hyperbolic language which would negate the impression that the [speaker] was seriously maintaining that" the assertion was a true statement.  *Gardner v. Martino*, 563 F.3d 981, 990 (9th Cir. 2009).  An examination of the context of the allegedly defamatory statements in question here reveals that they are not actionable.  Plaintiff identifies two categories of allegedly defamatory statements:  (1) the alleged accusation that Romeo was a pedophile; and (2) the comments regarding Romeo's career being impacted by the allegations.

***Alleged Pedophile Accusations***:  Keem did not actually ever "accuse" Romeo of "pedophilia."  Although he does use the slang word "pedo" on occasion in the videos, a close examination of Keem's statements makes plain that he was using the term "pedo" loosely and figuratively, rather than as a statement of fact.  For example, in the February 10, 2020, video Keem says: " . . . I just want to get everything we possibly can out there, because, you know, even though we broke this story -- we're saying, 'Hey look man this guy is like a pedo, like stay away from him, he's doing this stuff with underage girls.' -- still he is finding victims."  RJN Ex. 27; Westlund Dec. Ex. 4 at p. 26.  *See, e.g., Higher Balance, LLC v. Quantum Future Grp., Inc.*, No. CIV. 08-233-HA, 2008 WL 5281487, at *10 (D. Or. Dec. 18, 2008) (a reasonable audience would interpret the statement "It's really starting to look like [the plaintiff's business] is merely . . . a front for pedophilia" as expressing opinion).

In any event, were the Court to find that these are statements of fact, they are true.  Romeo himself expressly and tacitly admits as much in the March 17, 2019 video and the Complaint.  *See Harrell v. George*, No. CIV S-11-0253 MCE DAD PS, 2012 WL 3647941, at *7 (E.D. Cal. Aug. 22, 2012) (statements making "many innuendos of criminal and reprehensible conduct" were nonactionable because the plaintiff failed to allege any specific falsity).  Romeo, both in his interview and in his Complaint, admitted that he engaged in sexually explicit conversations and at least one sexual relationship with minors.[7]  Nor does the Complaint dispute that Romeo had this conversation with a minor or that the accusations of the other girls were true.

---

[7]  Although Romeo claims that he did not know that one of the four girls (Meerah) was underage, that contention is contradicted by a message he sent to the minor acknowledging he knew she was younger than 18 years old, which the Complaint does not dispute he sent.  RJN Ex. 27; Westlund Dec. Ex. 4 at p. 24.  The Court "need not accept as true conclusory allegations that are contradicted by documents referred to in the complaint," *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008), or which are contradicted by judicially noticeable materials, *Howard v. Cty. of Riverside*, No. EDCV 12-00700 VAP (OPx), 2013 WL 12138760, at *5 (C.D. Cal. Jan. 10, 2013).

1    ***Allegations Regarding The Impact On Romeo's Career***.  Romeo complains

2    about three comments:  "[Plaintiff] is finished"; "[Plaintiff's] career is over"; and

3    "[Plaintiff] belongs in a cage."  Dkt. 1 ¶ 20.  Keem's statements about Romeo's

4    career are nothing more than opinion and are not susceptible to verification.  *See*,

5    *e.g.*, *Glob. Telemedia Int'l, Inc. v. Doe 1*, 132 F. Supp. 2d 1261, 1268-69 (C.D. Cal.

6    2001) (in granting anti-SLAPP motion, court held defendant's reference to plaintiff

7    as a "sinking ship" was an opinion because a reasonable reader would not interpret

8    the statement as anything more than a "sarcastic crack[]"); *Art of Living Found. v.*

9    *Does*, No. 10-CV-05022-LHK, 2011 WL 2441898, at *8 (N.D. Cal. June 15, 2011)

10   (defendant's conclusion that plaintiff must be a "front-end name for a group of

11   fraudulent NGOs" that are committing "large-scale organized fraud according to the

12   laws of several countries" cannot be proven true or false).

13                    **b.        Romeo Cannot Show Actual Malice**

14           Additionally, the First Amendment shields Keem's statements because

15   Plaintiff is a public figure and therefore Romeo must prove that defendant's speech

16   was made with actual malice, i.e., "knowledge of its falsity or reckless disregard for

17   whether it was false, and that the statement was materially false."  *Resolute Forest*

18   *Products*, 302 F. Supp. 3d at 1017, citing *New York Times v. Sullivan*, 376 U.S. 254,

19   279-80 (1964).  Here, Romeo is a limited public figure because a public controversy

20   existed when the statements were made (i.e., Yellowchairr and Ultrahoney1's Twitter

21   messages were already public), the alleged defamation is related to Romeo's

22   participation in the controversy, and Romeo voluntarily injected himself into the

23   controversy when he asked to be (and was) interviewed by Keem for the purpose of

24   influencing the controversy's ultimate resolution.  *See Resolute Forest Products*, 302

25   F. Supp. 3d at 1017.  Romeo, as a limited public figure, must therefore plead and

26   prove actual malice.

27           To show actual malice, Romeo must prove by clear and convincing evidence

28   that Keem "entertained serious doubts as to the truth" of his statements.  *Gertz v.*

*Robert Welch, Inc.*, 418 U.S. 323, 334 n.6 (1974).  He must provide specific details to render the state-of-mind allegations plausible.  *Resolute Forest Products*, 302 F. Supp. 3d at 1018.  Here, Plaintiff does not (and cannot) even allege in a conclusory fashion that Keem's statements (or those of the girls) were (a) false; or (b) made by Keem with knowledge of their falsity or reckless disregard for their truth.

### 2.   Plaintiff Fails To State A Claim For Tortious Interference With Prospective Economic Advantage

The elements of tortious interference with prospective economic advantage in California are:  "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional [wrongful] acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant."  *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1151 (9th Cir. 2008) (alteration in original) (quoting *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153 (2003)).[8]  In addition, the plaintiff must plead facts showing that the defendant engaged in conduct that was wrongful "by some legal measure other than the fact of interference itself."  *Piping Rock* Partners, 946 F. Supp. 2d at 980 (quoting *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal. 4th 376, 393 (1995)) (internal quotation marks omitted).

Plaintiff here does not sufficiently allege the cause of action for intentional interference with prospective economic advantage because he fails to allege the existence of an economic relationship with a third party with the probability of future economic benefit, and he fails to allege independently wrongful conduct.

---

[8]  Presumably Plaintiff's claims are for intentional and not negligent interference (*see, e.g.,* Dkt. 1 ¶ 31), although the claims are not labeled as such.  The tort of negligent interference arises only when the defendant owes the plaintiff a duty of care, which has not been, and cannot be alleged here.  *See J'Aire Corp. v. Gregory*, 24 Cal. 3d 799, 803 (1979).

The only allegedly wrongful conduct independent of the alleged interference itself is Keem's purported defamation of Romeo.[9]  However, Plaintiff has not adequately pled defamation and therefore cannot prevail on his claim for intentional interference with prospective economic advantage.[10]  *See Epicor Software Corp. v. Alternative Tech. Sols., Inc.*, No. SACV 13-00448-CJC(RNBx), 2013 WL 3930545, at *7 (C.D. Cal. June 21, 2013) ("Given the Court's finding that the news release is not actionable defamation, this ground cannot provide the independent wrongful act necessary for Alternative's intentional interference claim").

Moreover, Plaintiff's conclusory allegations of business and economic relationship disruption are insufficient to state a claim for tortious interference with prospective economic relations.  Plaintiff must plead and prove a business relationship with a "specific third party" containing "'the probability of future economic benefit to the plaintiff.'"  *Piping Rock Partners*, 946 F. Supp. 2d at 980.  "[T]he interference tort applies to interference with *existing* noncontractual relations . . . .  In other words, it protects the expectation that the relationship eventually will yield the desired benefit, not necessarily the more speculative expectation that a potentially beneficial relationship will eventually arise."  *Westside Ctr. Assocs. v.*

---

[9]  Plaintiff alleges that he "believes" "Defendant's conduct, as alleged above, disrupted Plaintiff'[s] prospective economic advantage in obtaining his previously consistent stream of clients and revenue."  Dkt. 1 ¶ 29.  The conduct alleged "above" is presumably the allegedly defamatory statements on the DramaAlert videos which Plaintiff identified, i.e., the alleged statements "accus[ing] Plaintiff of pedophilia" and the statements regarding Plaintiff's career (i.e., "[Plaintiff] is finished"; "[Plaintiff's] career is over"; "[Plaintiff] belongs in a cage").  Dkt. 1 ¶¶ 11, 20-21.

[10]  Romeo's allegation that he had "no prior knowledge of the recording [made by 15-year-old Meerah of Romeo's display of his penis over the FaceTime call], nor had he ever given consent for its creation" is irrelevant.  Keem's publication of the recording was privileged irrespective of whether it was illegally created.  *See Bartnicki v. Vopper*, 532 U.S. 514, 535 (2001) (First Amendment barred suit against media entity that published the contents of illegally intercepted cell phone communications, which the media entity had acquired through lawful means, because "a stranger's illegal conduct does not suffice to remove the First Amendment shield from speech about a matter of public concern").

1 *Safeway Stores 23, Inc.*, 42 Cal. App. 4th 507, 524 (1996) (emphasis in original).

2 *See also Google Inc. v. Am. Blind & Wallpaper Factory, Inc.*, No. C 03-05340 JF,

3 2005 WL 832398, at *8 (N.D. Cal. Mar. 30, 2005) (allegations amounting to "a mere

4 hope for an economic relationship and a desire for future benefit" are inadequate)

5 (internal quotation omitted).

6       Here, Plaintiff has not identified any specific opportunities that he lost and of

7 which Defendant had knowledge and intent to interfere.  Plaintiff has merely asserted

8 in conclusory fashion that Defendant interfered with "his previously consistent

9 stream of clients and revenue," and has failed to plead facts in support of this

10 conclusion, which is insufficient.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

11 ("Threadbare recitals of the elements of a cause of action, supported by mere

12 conclusory statements, do not suffice" to state a claim.).[11]

13                **3.**     **Plaintiff Fails To State A Claim For Interference With**

14                    **Contractual Relations**

15       In order to state a claim for intentional interference with contractual relations,

16 a plaintiff must specifically identify the contract(s), the terms of the contract(s), and

17 how the defendant would have known about them.  *United Artists Corp. v. United*

18 *Artist Studios LLC*, No. CV 19-828-MWF (MAAx), 2019 WL 8221088, at *5 (C.D.

19

20 _____

[11]  Numerous courts have held similar allegations are insufficient.  *See, e.g.*, *Peak*

21 *Health Ctr. v. Dorfman*, No. 19-cv-04145-VKD, 2019 WL 5893188, at *6 (N.D. Cal. Nov. 12, 2019) (plaintiff may not rely only on general allegations of "loss of

22 business opportunities" with unidentified "existing and potential clients and customers" or "business co-venturers"); *Nestle USA, Inc. v. Crest Foods, Inc.*, No.

23 LA CV16-07519 JAK (AFMx), 2017 WL 3267665, at * 14 (C.D. Cal. July 28, 2017) ("merely referring to customers in general is not sufficient to show a specific

24 prospective relationship"); *Syberbound*, 517 F.3d at 1151 (dismissing plaintiff's interference with prospective advantage claim because plaintiff "merely states in a

25 conclusory manner that it 'has been harmed because its ongoing business and economic relationships with [c]ustomers have been disrupted.'  [Plaintiff] does not

26 allege, for example, that it lost a contract nor that a negotiation with a [c]ustomer failed."); *Google Inc.*, 2005 WL 832398, at *9 (relationship with "repeat customers"

27 was too speculative and did not "rise to the level of the requisite promise of future economic advantage").

28

Cal. Aug. 2, 2019) (dismissing a claim for intentional interference with contractual relations because the complaint "fail[ed] to identify any terms of the alleged contracts, the terms of the contracts that were specifically breached, or how [Cross-Defendant] would have known about those contracts"); *Nexsales Corp. v. Salebuild, Inc.*, No. C-11-3915 EMC, 2012 WL 216260, at *4 (N.D. Cal. Jan. 24, 2012) (plaintiff's claim for intentional interference with contractual relations insufficiently pled where plaintiff alleged generally that a contract existed "but fail[ed] to identify any terms of the contract, the parties involved, the terms of the contract that were breached, [and] how Defendant would have known of the contract").

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, this Court should grant Defendant's special motion striking the Complaint and award Defendant his attorneys' fees and costs. *See Verizon Delaware, Inc. v. Covad Commc'ns Co.*, 377 F.3d 1081, 1091 (9th Cir. 2004).  Keem respectfully requests that the amount of the fee award be reserved for later briefing following the hearing on this motion.  *See Novel v. Los Angeles County Sheriff's Dept.*, No. 2:19-cv-01922-RGJ-AGR, 2019 WL 6448955, at *1 (C.D. Cal. Aug. 20, 2019) (court considered motion for attorneys' fees after grant of Motion to Strike under anti-SLAPP statute).

DATED:  May 1, 2020                    BROWNE GEORGE ROSS LLP


By:   ___/s/ Kim S. Zeldin___
                Kim S. Zeldin
Attorneys for Defendant  DANIEL
"KEEMSTAR" KEEM, dba DRAMAALERT